UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
Rebecca Weinreb, David M. Weinreb,

                    Plaintiffs,            16 Civ. 6823 (DAB)
                                           **MEMORANDUM & OPINION**


                    -v.-


Xerox Business Services, LLC Health
and Welfare Plan, Conduent HR
Consulting, LLC, and Caremark PCS
Health LLC,

                    Defendants.
------------------------------------X

DEBORAH A. BATTS, United States District Judge.

     This Action involves a dispute between an Employee

Retirement Income Security Act ("ERISA") beneficiary and her

spouse's employer, health benefits plan, and insurance

administrator over prescription drug coverage. At issue is

whether the administrator's refusal to cover a prescription for

fentanyl violates the mandates of ERISA, Title VII and the

Pregnancy Discrimination Act, the Equal Pay Act, and the

Affordable Care Act. Before the Court are Defendants' Motions to

Dismiss Plaintiffs' Second Amended Complaint pursuant to Rule

12(b)(6) of the Federal Rules of Civil Procedure. As explained

in detail below, Plaintiffs have failed at every juncture to

articulate how Defendants have discriminated against women on

the basis of sex under the law. Thus, Defendants' Motions to Dismiss are GRANTED WITH PREJUDICE without leave to replead.

I.   Background

A. Factual History

For the purposes of the Motions to Dismiss, the Court assumes as true the factual allegations in Plaintiffs' Second Amended Complaint (hereinafter "Complaint" or "Compl.").

Plaintiff David M. Weinreb is an employee of Conduent HR Consulting, LLC, formerly a subsidiary of Xerox Corporation ("Employer"). (Compl. ¶ 3.) Mr. Weinreb is a participant in the Xerox Business Services, LLC Health and Welfare Plan (the "Plan"). (Id.) The Plan, an employee welfare benefit plan as defined by the Employee Retirement Income Security Act, 29 U.S.C. § 1002, provides medical and prescription insurance coverage to its participants and beneficiaries. (Id. ¶ 5.) The Employer is a Plan sponsor and fiduciary within the meaning of ERISA. (Id. ¶¶ 6-7 (citing 29 U.S.C. § 1000(16)(B); § 1002(21).) Though the Plan is self-funded (i.e. - it pays for prescription drugs out of its own assets rather from a separate insurance company), the Plan employs a third-party administrator, Caremark PCS Health LLC ("Caremark"), to make eligibility and coverage

determinations. (Id. ¶ 8.) The Plan grants discretionary authority to Caremark to make such determinations and handle appeals. (Id.).

Plaintiff Rebecca Weinreb, David Weinreb's wife, is a beneficiary of the Plan. Ms. Weinreb has been ill for seventeen years with an orphan disease[1] known as Global Diffuse Adenomyosis ("GDA"). (Id. ¶ 10.) Adenomas are benign tumors that are inoperable because they secrete hormones that cause the body to continuously contract as if it were active labor, without an epidural. (Id.) GDA only affects women. (Id.) Ms. Weinreb's body is riddled with adenomas that originated in her uterus and have now spread to other organs. She suffers "constant[,] excruciating pain with no let up and her pain levels are 'astronomical.'" (Id.) She contracted the disease shortly after she underwent a caesarian section to deliver her fourth child on July 11, 2001. (Id. ¶ 11.)

Ms. Weinreb's physician, Dr. Gordon Freedman, experimented with several drug combinations in an effort to provide her with

---

[1] "Orphan diseases" are diseases that affect very few people worldwide. Often, no curative drug therapy has been developed for these diseases "because the small market would make the research and the drug unprofitable." (Compl. ¶ 10); see also U.S. Food & Drug Administration, Orphan Products: Hope for People with Rare Diseases, https://www.fda.gov/drugs/resourcesforyou/ consumers/ucm143563.htm (last updated March 1, 2018).

pain relief. (Id. ¶ 12.) After Morphine, Oxycontin, and

"numerous other" drugs proved ineffective, he prescribed Actiq,

a stick lozenge form of the potent pain-relief opioid fentanyl.[2]

(Id. ¶ 13.) Actiq included sugar in its formula, however, which

caused Ms. Weinreb's teeth to dissolve and her gums to bleed and

become infected. (Id.) After four years on Actiq, Dr. Freedman

transitioned Ms. Weinreb to newly available tablet and spray

forms of fentanyl, known as Fentora and Subsys. (Id. ¶ 15.)[3]

From January 2009 through January 2014, Medco/Express

Scripts was the administrator of Xerox's prescription drug

benefit Plan. (Id. ¶ 18.) Though Medco required Ms. Weinreb to

receive prior authorization to receive these drugs, "[s]he was

always granted approval by Medco at the First Tier Appeal Level

for the quantity that she needed fairly quickly and easily."

(Id. ¶ 19.)

According to Plaintiffs, "[a]ll this changed on January 1,

2014, when Caremark took over the administration of the drug

plan from Medco." (Id. ¶ 20.) Plaintiffs allege that Caremark

---

[2] Fentanyl, according to the Complaint, is a "potent synthetic opioid
analgesic with a rapid onset and short duration of action, used to
treat breakthrough pain." (Compl. ¶ 12.)

[3] It appears that Mr. Weinreb was employed by another employer from
2001 through at least 2010. That employer's Plan covered Ms. Weinreb's
medications without a problem. (Compl. ¶ 16.)

rescinded Medco's annual prior authorization approvals midway through 2014. (Id. ¶¶ 22-24.) Plaintiffs claim Caremark refused to reinstate coverage for Fentora at all, and only agreed to approve a small amount of Subsys every 25 days. (Id. ¶¶ 26-28.) This provided less pain relief to Ms. Weinreb and increased the amount of time she would have to wait for refills. (Id. ¶¶ 30-31.) Dr. Freedman wrote Caremark that Ms. Weinreb's prescriptions were "medically necessary" to treat her "extremely high level of pain" and irregular flare ups. (Id. ¶ 33.)

On June 29, 2015, Plaintiffs claim Ms. Weinreb received a telephone call from a Caremark representative, Sally, who advised her that Caremark would be denying her Subsys and any other fentanyl drug going forward. (Id. ¶ 37.) Sally allegedly explained that "she retroactively withdrew Ms. Weinreb's Prior Authorizations for fentanyl drugs claiming that fentanyl is approved only for cancer patients with malignant tumors but not for individuals such as Ms. Weinreb suffering from a non-cancer illness." (Id. ¶ 42.) Nonetheless, Dr. Freedman thereafter applied for prior authorization of Ms. Weinreb's initial fentanyl drug, Actiq, which "Caremark approved only the tragically laughable amount of 120 lozenges per month, although Dr. Freedman issued a prescription indicating that Ms. Weinreb

needed 24 lozenges per day, 720 units, for each three week period." (Id. ¶¶ 45-48.)

Since 2014, Plaintiffs claim Ms. Weinreb "has become a ghost of her former self, hardly able to move from one room to the next. She has been paralyzed in pain for hours each day . . . ." (Id. ¶ 53.)

Plaintiffs assert Ms. Weinreb exhausted her internal administrative appeals for the denial of her "fentanyl medication."[4] Caremark denied Ms. Weinreb's appeals because her requested prescription coverage was outside the terms of the Plan: the Plan only provides coverage for fentanyl prescriptions if they are "medically necessary." (Id. ¶¶ 58-69.) As explained in more detail below, the Plan defines "medically necessary" fentanyl prescriptions as prescribed "only for the management of breakthrough cancer pain in patients." Because Ms. Weinreb does not suffer from cancer or cancer pain, her appeal was denied.

B. Plan Documents and Medical Necessity

For certain medications, such as Actiq and other fentanyl medications, the Plan requires a beneficiary to obtain prior

---

[4] It is unclear from the Complaint whether she exhausted her appeals for Actiq and Subsys. Defendants assert she only exhausted her appeals for Actiq.

authorization from Caremark. (Administrative Record ("AR") at 980.)[5] Caremark provides prior authorization for a prescription drug only if it is "medically necessary." (Id.)

The Plan provides a Summary Plan Description (SPD) to all participants and beneficiaries. The SPD defines medical necessity as follows:

> Medically necessary or medical necessity: Health care or dental services, and supplies or prescription drugs that a physician, other health care provider or dental provider, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms. The provision of the service, supply or prescription drug must:
> - Be in accordance with generally accepted standards of medical or dental practice,
> - Be clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease,
> - Not be primarily for the convenience of the patient, physician, other health care or dental provider, and
> - Not be more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.
> - For these purposes "generally accepted standards of medical or dental practice" means standards that are based on credible scientific evidence published in peer-reviewed literature generally recognized by the relevant medical or dental community, or otherwise consistent with physician or dental specialty society

---

[5] The Complaint refers repeatedly to the Plan Documents of the Administrative Record filed previously in this case. The Plan Documents are incorporated by reference into the Complaint. DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

recommendations and the views of physicians or dentists practicing in relevant clinical areas and any other relevant factors. <u>Medical necessity is determined by the medical or dental plan administrator in accordance with its clinical guidelines.</u>

(AR 1155-56 (emphasis added).) The SPD itself does not mention fentanyl prior authorizations specifically.

The SPD states that the Plan's clinical guidelines are available to anyone by visiting Caremark's website and that if a participant or beneficiary has any questions, they may visit the website or call a toll-free number and request a copy of the guidelines. (AR 999; AR 1022.)

The guidelines state: "Abstral, Actiq, Fentora, Lazanda, Onsolis, and Subsys are indicated ONLY for the management of breakthrough cancer pain in patients with malignancies who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain. . . . Actiq is indicated in patients 16 years of age or older; Abstral, Fentora, Lazanda, Onsolis, and Subsys are indicated in patients 18 years of age and older." (AR 893.)

As Plaintiffs acknowledge in their Complaint, this guideline is consistent with the Food and Drug Administration's approved "label" for Actiq. <u>See</u> U.S. Food & Drug Administration Label, Actiq, http://www.accessdata.fda.gov/drugsatfda_docs/

label/1998/20747lbl.pdf (Nov. 4, 1998) ("Actiq is indicated only for the management of breakthrough cancer pain in patients with malignancies who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."); see also Compl. ¶ 65. When the FDA approves a drug, it is based on clinical trials and research for one type of use and/or for one condition. When a doctor prescribes such a drug in accordance with the use performed at trial, that is called "on-label" use. (Compl. ¶¶ 65-67.) However, once the FDA approves a drug, healthcare providers may still prescribe the drug for an "unapproved" use if they deem it medically appropriate. (Id.; see also U.S. Food & Drug Administration, Understanding Unapproved Use of Approved Drugs "Off Label", https://www.fda.gov/forpatients/other/offlabel/default.htm (last updated February 5, 2018.) This is called "off-label" use. According to Plaintiffs, "it is [not] illegal for a doctor to prescribe the drug for an off-label use. All that non-labeling means is that the FDA has not performed the tests it would need to conduct to confirm that fentanyl is effective to provide relief to patients suffering from breakthrough pain on account of GDA." (Compl. ¶ 66.) Plaintiffs assert further that "the FDA does not test the effectiveness of every drug for every possible

use. In fact, in the case of a rare disease, such as GDA, it is unlikely that the FDA would conduct the tests it would need to determine the effectiveness of fentanyl to treat the breakthrough pain caused by the GDA . . . ." (Id. ¶ 67.)

## C. Procedural History

On August 30, 2016, Plaintiff Rebecca Weinreb filed a Complaint against Xerox Business Services, LLC Health and Welfare Plan bringing a single claim pursuant to ERISA § 502(a). (Dkt. 1.) Xerox Business Services, LLC Health and Welfare Plan answered the initial Complaint on October 24, 2016. (Dkt. 13.) The Parties then cross-moved for Summary Judgment on January 5, 2017 and stipulated to an administrative record. (Dkts. 20-41.) On April 13, 2017, the Court ordered the Parties to brief "whether and to what extent Defendants denial of Plaintiff's claims implicates Title VII, the Pregnancy Discrimination Act, and/or Section 1557 of the Affordable Care Act." (Dkts. 42.) The Parties briefed the issue on May 12, 2017 and June 12, 2017. (Dkts. 43-44.)

Plaintiff then sought leave to amend her Complaint a first time, seeking to add new Defendants Caremark Mail Pharmacy and CVS Caremark, as well as add new claims for sex discrimination

under the New York State Human Rights Law, New York City Human Rights Law, and the New Jersey Law Against Discrimination. The Court granted Plaintiff leave to amend on August 3, 2017. (Dkt. 46.) Plaintiff then filed the First Amended Complaint on August 28, 2017. (Dkt. 47.) By allowing Plaintiff to file an Amended Complaint adding new claims and Defendants, the Court treated as moot Ms. Weinreb's and Xerox Business Services, LLC Health and Welfare Plan's original Motions for Summary Judgment of January 5, 2017.[6]

---

[6] "It is well-established than an amended complaint ordinarily supersedes the original and renders it of no legal effect." Int'l Controls Corp. v. Vesco, 556 F.2d 665, 668 (2d Cir. 1977). "For this reason, courts in this circuit routinely deny summary judgment motions as moot, or even vacate prior grants of summary judgment, when the motion was based on a complaint that has been rendered legally inoperative." Travelers Cas. v. Dipizio Constr. Co., Inc., No. 14-CV-576-FPG, 2016 WL 3476448, at *2 (W.D.N.Y. June 21, 2016) (citing Benavidez v. Piramides Mayas Inc., No. 09 CIV. 5076 KNF, 2013 WL 1627947, at *5 (S.D.N.Y. Apr. 16, 2013); Thompson v. Pallito, 949 F. Supp. 2d 558, 583 (D. Vt. 2013)); see also Travelers, 2016 WL 3476448, at *2 (rendering as moot summary judgment motions of initial complaint after filing of amended complaint because plaintiff added new claims and defendants such that "changes between the First Amended Complaint and the Second Amended Complaint counsel strongly against consideration of the interceding summary judgment motion"); Tolbert v. Koenigsmann, No. 913CV1577LEKDEP, 2016 WL 223713, at *3 (N.D.N.Y. Jan. 19, 2016) ("In light of the amendment of Plaintiff's Complaint, the Court denies Plaintiff's Motion for summary judgment and Defendants' Cross-Motion for summary judgment as moot."); Hanrahan v. Menon, No. 9:07-CV-610FJS/ATB, 2010 WL 984279, at *1 (N.D.N.Y. Mar. 15, 2010) ("In light of the fact that the Court granted Plaintiff's motion to amend his complaint and that his amended complaint has replaced his original complaint in its entirety, Defendant Dr. Menon's motion for summary judgment, directed as it was to the original complaint, is now moot.").

On October 24, 2018, Defendants Xerox and Caremark both moved to dismiss the First Amended Complaint. (Dkts. 58-61.) Rather than oppose the Motion to Dismiss the First Amended Complaint, Plaintiff sought leave to amend and file a Second Amended Complaint to cure any deficiencies with the First Amended Complaint. Defendants consented. The Court granted leave on January 3, 2018, and Plaintiff filed the Second Amended Complaint the same day.[7] (Dkts. 65-69.)

The Second Amended Complaint, the operative Complaint at issue, is brought on behalf of Rebecca Weinreb and David M. Weinreb against Xerox Business Services, LLC Health and Welfare Plan (the "Plan"), Conduent HR Consulting, LLC, (the "Employer") and Caremark PCS Health LLC. ("Caremark"). (Dkt. 67 ("Complaint").)[8]

The Complaint alleges: (i) a claim against the Plan and Caremark under ERISA § 502(a); (ii) a claim against the Employer for violations of Title VII and the Pregnancy Discrimination

---

[7] Just as it did with the Motions for Summary Judgment of the initial Complaint, the Court treated as moot Defendants' Motions to Dismiss the First Amended Complaint by the filing of a Second Amended Complaint. See supra note 6 and accompanying text.

[8] Note also that Plaintiff was issued a Right-to-Sue letter by the EEOC on January 10, 2018. (See Ex. A. to Def. Xerox's Mot. to Dismiss 2AC, dkt. 76-1.)

Act; (iii) a claim against the Employer for violations of the Equal Pay Act; and (iv) a claim against Caremark under Section 1557 of the Affordable Care Act. (Id.)[9]

Defendants each moved to dismiss the claims against them on February 5, 2018: The Plan moved to dismiss Plaintiffs' ERISA claims; The Employer moved to dismiss the Title VII, PDA, and EPA claims; and Caremark moved to dismiss the ERISA claims and the Affordable Care Act claims. Plaintiffs opposed all Motions on March 19, 2018. (Dkts. 75-81.) Defendants replied on April 9, 2018. (Dkts. 85-86.)

## II.  Discussion

Defendants Xerox Business Services Health and Welfare Plan (the "Plan"), Conduent (the "Employer"), and Caremark each move to dismiss the respective claims brought against them.

As explained in detail below, Defendants Caremark and the Plan's Motions to Dismiss Plaintiffs' ERISA claims are GRANTED because Plaintiffs only put forward legal conclusions unsupported by factual allegations in their Complaint. Moreover, since Caremark's decision to deny Ms. Weinreb coverage for

---

[9] Though the Complaint references an EPA claim before its Title VII/PDA claim, the Court analyzes the Title VII/PDA claim first.

fentanyl was dictated by the clear and unambiguous terms of the Plan, it was not arbitrary and capricious under ERISA.

The Employer's Motion to Dismiss Plaintiffs' Title VII, PDA, and EPA claims is also GRANTED. Plaintiffs have been given two opportunities to amend their Complaint and adequately allege claims for sex discrimination. At every juncture, Plaintiffs have failed to meet the pleading standards for Title VII, the PDA, and the EPA. Plaintiffs do not articulate how the terms of the plan discriminate against women on the basis of sex. Rather, Plaintiffs make conclusory claims alleging that the Plan somehow discriminates against heterosexual males, without any support.

Finally, Caremark's Motion to Dismiss Plaintiffs' Affordable Care Act claims is GRANTED because Plaintiffs do not plead facts sufficient to support an inference that Caremark intentionally discriminated against Ms. Weinreb, nor that the discrimination was a substantial or motivating factor in Caremark's actions.

Because Plaintiffs fail to state a claim on any of their causes of action under ERISA, Title VII and the PDA, the Equal Pay Act, and the Affordable Care Act, their Complaint is DISMISSED WITH PREJUDICE in its entirety against all Defendants, without leave to replead.

A. <u>Motion to Dismiss Legal Standard</u>

For a complaint to survive a motion brought pursuant to
Federal Rule of Civil Procedure 12(b)(6), the plaintiff must
have pleaded "enough facts to state a claim to relief that is
plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S.
544, 570 (2007). The Supreme Court explained,

> A claim has facial plausibility when the plaintiff
> pleads factual content that allows the court to draw the
> reasonable inference that the defendant is liable for
> the misconduct alleged. The plausibility standard is not
> akin to a "probability requirement," but it asks for
> more than a sheer possibility that a defendant has acted
> unlawfully. Where a complaint pleads facts that are
> "merely consistent with" a defendant's liability, it
> "stops short of the line between possibility and
> plausibility of entitlement to relief."

<u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (<u>quoting</u> <u>Twombly</u>,
550 U.S. at 556–57). "[A] plaintiff's obligation to provide the
grounds of his entitlement to relief requires more than labels
and conclusions, and a formulaic recitation of the elements of a
cause of action will not do." <u>Twombly</u>, 550 U.S. at 555 (internal
quotation marks and citation omitted). "Nor does a complaint
suffice if it tenders 'naked assertion[s]' devoid of 'further
factual enhancement.'" <u>Iqbal</u>, 556 U.S. at 678 (<u>quoting</u> <u>Twombly</u>,
550 U.S. at 557). The Supreme Court has further stated,

> In keeping with these principles a court considering a
> motion to dismiss can choose to begin by identifying
> pleadings that, because they are no more than

15

> conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Id. at 679.

In considering a Rule 12(b)(6) motion, the Court must accept as true all factual allegations set forth in the complaint and draw all reasonable inferences in favor of the plaintiff. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 (2002); Blue Tree Hotels Inv. (Canada) Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004). However, this principle is "inapplicable to legal conclusions," Iqbal, 556 U.S. at 678, which, like the complaint's "labels and conclusions," Twombly, 550 U.S. at 555, are disregarded. Nor should a court "accept [as] true a legal conclusion couched as a factual allegation." Id. at 555. In resolving a 12(b)(6) motion, a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

B. ERISA

Defendant Caremark first moves to dismiss Plaintiffs' first
claim for relief under ERISA. (Dkt. 78.) Because Plaintiffs only
advance legal conclusions in their Complaint unsupported by
facts, their ERISA claims are fundamentally deficient. At issue
is whether Caremark's decision to deny Ms. Weinreb coverage for
off-label fentanyl use was arbitrary and capricious. Since the
administrator applied the plain letter of the Plan's clinical
guidelines and Summary Plan Description, its decision was not
arbitrary and capricious as a matter of law.

As explained infra, the guidelines and Summary Plan
Description clearly state that the plan will only provide
benefits for fentanyl to treat cancer-related pain, also known
as FDA-approved, "on-label" use. Because Ms. Weinreb does not
suffer from cancer, she does not qualify for fentanyl coverage
under the terms of the plan. Thus, the administrator did not
violate ERISA by failing to provide Ms. Weinreb fentanyl
coverage. Plaintiffs' first claim for relief under ERISA is
DISMISSED WITH PREJUDICE.

1. Standard of Review

Pursuant to 29 U.S.C. § 1132, a participant or beneficiary
of a benefit plan governed by ERISA may bring a civil action "to

17

recover benefits to due to him under the terms of his plan . . .

." 29 U.S.C. § 1132(a)(1)(B) (2012). A denial of ERISA benefits

"is to be reviewed under a de novo standard unless the benefit

plan gives the administrator or fiduciary discretionary

authority to determine eligibility for benefits or to construe

the terms of the plan." Firestone Tire & Rubber Co. v. Bruch,

489 U.S. 101, 115 (1989). Where a plan administrator or

fiduciary has discretion to determine eligibility for benefits,

"the benefits decision is reviewed under the arbitrary and

capricious standard." Krauss v. Oxford Health Plans, Inc., 517

F.3d 614, 622 (2d Cir. 2008) (citing Fay v. Oxford Health Plan,

287 F.3d 96, 104 (2d Cir. 2002)).

The "scope of judicial review is narrow" under the

arbitrary and capricious standard. Celardo v. GNY Auto. Dealers

Health & Welfare Tr., 318 F.3d 142, 146 (2d Cir. 2003). An

administrator's decision is arbitrary and capricious if it is

"without reason, unsupported by substantial evidence or

erroneous as a matter of law." Pagan v. NYNEX Pension Plan, 52

F.3d 438, 442 (2d Cir. 1995); see also O'Shea v. First Manhattan

Co. Thrift Plan & Tr., 55 F.3d 109, 112 (2d Cir. 1995) ("[W]here

[the administrator] of a plan impose[s] a standard not required

by the plan's provisions, or interpret[s] the plan in a manner

inconsistent with its plain words, or by [its] interpretation render[s] some provisions of the plan superfluous, [its] actions may well be found to be arbitrary and capricious."). The Second Circuit has held that "[s]ubstantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance.'" Celardo, 318 F.3d at 146 (quoting Miller, 72 F.3d at 1072); see also Franzese v. United Health Care/Oxford, 232 F. Supp. 3d 267, 275–76 (E.D.N.Y. 2017) (summarizing ERISA and arbitrary and capricious standards). A court is "not free to substitute its own judgment for that of the insurer as if the court were considering the issue of eligibility anew." Hobson v. Metropolitan Life Ins. Co., 574 F.3d 75, 83–84 (2d Cir. 2009).

Because the Plan grants Caremark discretion to determine eligibility for benefits, see Compl. ¶ 8; AR 1206-1207, this Court will employ arbitrary and capricious review. Krauss, 517 F.3d at 622; Zeuner v. Suntrust Bank Inc., 181 F. Supp. 3d 214, 219 (S.D.N.Y. 2016).

2. Application

The problem with Plaintiffs' Complaint as it relates to
ERISA is that it baldly states legal conclusions - often
incorrect legal conclusions – without any factual support. This
is unacceptable under Iqbal. See Iqbal, 556 U.S. at 678 ("In
keeping with these principles a court considering a motion to
dismiss can choose to begin by identifying pleadings that,
because they are no more than conclusions, are not entitled to
the assumption of truth. While legal conclusions can provide the
framework of a complaint, they must be supported by factual
allegations.").

For example, Plaintiffs erroneously assert that Caremark
was obligated to cover fentanyl medication for Ms. Weinreb under
ERISA simply because the previous administrator had covered such
medication. Plaintiffs state in their Complaint:

> At the time Caremark took over the administration of the
> drug plan from Medco, Ms. Weinreb had a Prior Authorization
> Approval Contract in place from Medco for both Fentora and
> Subsys, which was supposed to carry over. Caremark was
> supposed to have honored its obligation to cover both of
> these drugs . . . . Notwithstanding the fact that it was
> still mid-contract, Caremark, prematurely terminated Ms.
> Weinreb's Prior Authorization . . . .

(Compl. ¶¶ 21-23 (emphasis added).)

This is a legal conclusion that is flatly incorrect. The
Supreme Court has made clear that employers and administrators

may unilaterally terminate or amend a welfare benefit plan to reduce benefits at any time. See <u>Curtiss-Wright Corp. v. Schoonejongen</u>, 514 U.S. 73, 78 (1995) ("Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans."); <u>see also Schonholz v. Long Island Jewish Med. Ctr.</u>, 87 F.3d 72, 77 (2d Cir. 1996) ("Under ERISA it is the general rule that an employee welfare benefit plan is not vested and that an employer has the right to terminate or unilaterally to amend the plan at any time."); <u>Messmer v. Xerox Corp.</u>, 139 F. Supp. 2d 398, 402 (W.D.N.Y. 2001)("ERISA generally does not prevent employers from modifying or terminating welfare benefit plans, even if the effect is to discontinue a participant's benefits.").[10]

Plaintiffs put forward no facts or circumstances that would indicate that Caremark acted outside the confines of ERISA and that its determinations were arbitrary and capricious. In fact, a plain reading of the Plan documents make clear that the

---

[10] Courts have also specifically held that discretion in interpreting a plan's terms (or changing a plan's terms) passes from a former administrator to a new administrator. A new interpretation by a different administrator does not make the second administrator's interpretation arbitrary and capricious. <u>See</u>, <u>e.g.</u>, <u>Hess v. Reg-Ellen Machine Tool Corp.</u>, 423 F.3d 653, 662-63 (7th Cir. 2011); <u>White v. Sundstrand Corp.</u>, 256 F.3d 580, 585 (7th Cir. 2001).

administrator's decision to refuse coverage for Actiq was <u>not</u> arbitrary and capricious.

In their Complaint, Plaintiffs' claim that "a participant or beneficiary (or anyone else) of ordinary intelligence reviewing the terms of the Plan would have no reason to believe that fentanyl medication is not covered . . . under the Plan." (Compl. ¶ 64.)

Yet, the Summary Plan Description (SPD) provided to all participants in the plan clearly stated that the plan would only provide coverage for medications that are "medically necessary." (AR 980.) The SPD defined "medically necessary" as determined by the plan guidelines. (<u>Id.</u>) The clinical guidelines, in turn, make clear that medically necessary benefits are payable for prescriptions of Actiq only when the drug is being prescribed "on-label," or "for the management of breakthrough pain in a cancer patient who is already receiving around-the-clock opioid therapy for underlying cancer pain." (AR 1155-56.)

Ms. Weinreb does not have cancer. Ms. Weinreb does not satisfy the clinical guidelines and does not qualify for benefits under the Plan. The administrator's determination consistent with the plain letter of the guidelines and SPD is not arbitrary and capricious. See <u>Stern v. Oxford Health Plans,</u>

Inc., No. 12-CV-2379 JFB EBT, 2013 WL 3762898, at *8 (E.D.N.Y. July 17, 2013) ("An insurance company's denial of benefits is supported by substantial evidence when a plan explicitly bars coverage for that benefit."); Pesca v. Bd. of Trs., Mason Tenders' Dist. Council Pension Fund, 879 F. Supp. 23, 25 (S.D.N.Y. 1995) (holding denial of benefits was not arbitrary and capricious because the plan administrator "applied the plain letter of the Plan documents").

Plaintiffs' other assertion in their Complaint, that "it is apparent that since fentanyl is the only medication that can provide relief to Ms. Weinreb, fentanyl is considered medically necessary," (Compl. ¶ 75), is specious. The SPD clearly states that medical necessity is determined by the Guidelines. Nothing more. Plaintiffs may not rewrite the Plan to suit their own definition of medical necessity. As the Supreme Court has explained, "[n]othing in ERISA requires employers to establish employee benefit plans. Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan." Pegram v. Herdrich, 530 U.S. 211, 226-27 (2000); see also Heimeshoff v. Hartford Life & Accident Ins. Co., 571 U.S. 99, 108 (2013) ("Employers have large leeway to design disability and other welfare plans as they see fit." (quotation omitted));

<u>Curtiss-Wright Corp. v. Schoonejongen</u>, 514 U.S. 73, 78 (1995)

("ERISA does not create any substantive entitlement to employer-

provided health benefits or any other kind of welfare

benefits.").[11]

   In their brief, Plaintiffs shift course and argue that the

administrator's own interpretation of medical necessity was

arbitrary and capricious. They claim that the SPD's explanation

of what is "medically necessary" is not clear because it lists

five other objective "bullet point" factors for determining

medical necessity (such as being in accordance with generally

accepted standards of medical practice, being clinically

appropriate, not for convenience, etc.), and then has a separate

line at the end stating that medical necessity "is determined by

the medical or dental plan administrator in accordance with the

clinical guidelines." (AR 1155-56.)[12] Plaintiffs claim that a

---

[11] Moreover, it is the Plan documents which control in an ERISA suit,
not a battle over doctors' opinions. <u>See</u> <u>Black & Decker Disability</u>
<u>Plan v. Nord</u>, 538 U.S. 822, 834 (2003) ("[C]ourts have no warrant to
require administrators automatically to accord special weight to the
opinions of a claimant's physician; nor may courts impose on plan
administrators a discrete burden of explanation when they credit
reliable evidence that conflicts with a treating physician's
evaluation.").

[12] Recall that the SPD states:
      Medically necessary or medical necessity: Health care or dental
      services, and supplies or prescription drugs that a physician,
      other health care provider or dental provider, exercising prudent
      clinical judgment, would provide to a patient for the purpose of
      preventing, evaluating, diagnosing or treating an illness,

"participant of average intelligence would not read this last sentence of the definition as denying [Plaintiff] coverage of fentanyl for non-cancer pain . . . . The last sentence of this definition doesn't guide the reader to a document called clinical guidelines." (Pls.' Opp. Mot. Dismiss Second Am. Compl. ("2AC") at 6-7.)

That is simply not true. While the SPD does contain a list of objective factors that may be considered for determining medical necessity, it clearly states at the end that medical necessity is determined in "accordance with the clinical

---

injury, disease or its symptoms. The provision of the service, supply or prescription drug must:
- Be in accordance with generally accepted standards of medical or dental practice,
- Be clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease,
- Not be primarily for the convenience of the patient, physician, other health care or dental provider, and
- Not be more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.
- For these purposes "generally accepted standards of medical or dental practice" means standards that are based on credible scientific evidence published in peer-reviewed literature generally recognized by the relevant medical or dental community, or otherwise consistent with physician or dental specialty society recommendations and the views of physicians or dentists practicing in relevant clinical areas and any other relevant factors.

Medical necessity is determined by the medical or dental plan administrator in accordance with its clinical guidelines.
(AR 1155-56 (emphasis added).)

guidelines." (AR 1155-56.) Courts must interpret "ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience." Critchlow v. First UNUM Life Ins. Co. of Am., 378 F.3d 246, 256 (2d Cir. 2004). SPDs must summarize provisions of an ERISA contract in a way that is "calculated to be understood by the average plan participant." 29 U.S.C. § 1022(a) (2012); see also 29 C.F.R. § 2520.102-2 (2017) ("The format of the summary plan description must not have the effect to misleading, misinforming or failing to inform participants and beneficiaries. Any description of exception, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant."). The last sentence referring to the clinical guidelines in the SPD is clear and unmistakable, and can hardly be characterized as misleading.

Plaintiffs also argue in their brief that even though the SPD refers to the clinical guidelines in its definition of medical necessity, an average reader would read the five objective factors as controlling, or even view the guidelines definition as a sixth factor to be weighed in and of itself. (Pls.' Opp. Mot. Dismiss 2AC at 7.) Yet the SPD did not say that the clinical guidelines should only be "considered" or that they

were one factor to be weighed in determining what is medically necessary. The final sentence at hand is not a sixth bullet point. Rather, it is in its own paragraph that plainly stated that medical necessity "is determined by the medical or dental plan administrator in accordance with the clinical guidelines." (AR 1155-56.)

Finally, plaintiffs erroneously argue that the clinical guidelines were not distributed or made available to plan participants. (Pls.' Opp. Mot. Dismiss 2AC at 7.) Yet that is not the case. The SPD clearly stated that the guidelines were made available to participants at the Caremark website. (AR 1022.) Nor was it misleading for the SPD to cross-reference the guidelines and instruct participants to consult them. The Summary Plan Description is a summary, and courts have repeatedly held that an SPD need not "anticipate every possible idiosyncratic contingency that might affect a particular participant's" eligibility for benefits. Tocker v. Philip Morris Cos., Inc., 470 F.3d 481, 488 (2d Cir. 2006); see also Swanson v. U.A. Local 13 Pension Plan, 779 F. Supp. 690, 697 (W.D.N.Y. 1991); ("[A] Summary Plan description need not set forth in extensive detail every circumstance which might affect an

employee's benefits, or to provide personalized attention to individual employees.").


The Court is sympathetic to Plaintiff's painful plight. But the Court has no power to rewrite the Plan and change the definition of medical necessity. See Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan, 572 F.3d 76, 81 (2d Cir. 2009) ("[A] court must not rewrite, under the guise of interpretation, a term of the [ERISA] contract when the term is clear and unambiguous." (quotations omitted)). And, like many other courts before it, this Court must not let sympathy to force an ERISA fiduciary to violate its fiduciary duty. See, e.g., O'Shea v. UPS Ret. Plan, 837 F.3d 67, 70 (1st Cir. 2016) ("This suit . . . presents the highly sympathetic case of a retiree whose death one week before his official retirement date, but after his final day of work, had the unexpected consequence of depriving his beneficiaries of ten years of payments under an annuity plan. Though we regret the heartbreaking outcome, after careful consideration, we must affirm."); Lorenzen v. Emps. Ret. Plan of the Sperry & Hutchinson Co., 896 F.2d 228, 234 (7th Cir. 1990) ("In holding

for Mrs. Lorenzen the district judge appears to have been moved by the human appeal of her case. This is understandable. To have to decide whether to order the removal of life support from a loved one is painful enough without having to incur an enormous financial penalty into the bargain. The equities are not all on one side, however. (They rarely are; the tension between formal justice and substantive justice is often, and perhaps here, illusory.) Life-support equipment is expensive and, to a considerable degree, futile and degrading. It should not be used to secure retirement benefits."); Siemionko v. Bldg. Serv. 32B-J Ben. Funds, No. 07-CV-1548(RRM)(ALC), 2009 WL 3171955, at *9 (E.D.N.Y. Sept. 30, 2009) ("Although sympathetic to Plaintiff's situation, this Court agrees that the Funds' decision to deny Plaintiff's claim for disability benefits was not arbitrary and capricious.").

The Court dismisses Plaintiffs' ERISA claims with prejudice because the administrator's decision was not arbitrary and capricious.


C. Title VII and the PDA

Defendant Conduent next moves to dismiss Plaintiffs' sex- and pregnancy-discrimination claims under Title VII and the

Pregnancy Discrimination Act ("PDA"). As explained below, Plaintiffs have been given multiple opportunities to put forward facts sufficient to support a claim for sex discrimination. Rather than alleging that the Employer's denial of benefits discriminates against women on the basis of sex, Plaintiffs peculiarly allege that the Employer discriminated against Mr. Weinreb on the basis of his sex. Regardless, they fail to meet the pleading standards for either a disparate treatment claim against men or disparate impact claim against men cognizable under Title VII and the PDA. Plaintiffs' third claim for relief is DISMISSED WITH PREJUDICE.

Section 703(a) of the Civil Rights Act of 1964 makes it an unlawful employment practice for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2002e-2(a) (2012). As the Supreme Court made clear in Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C., 462 U.S. 669 (1983), "[h]ealth insurance and other fringe benefits are 'compensation, terms, conditions, or privileges of employment.'" Id. at 682. "Male as well as female employees are protected against discrimination. Thus, if a private employer

were to provide complete health insurance coverage for the dependents of its female employees, and no coverage at all for the dependents of its male employees, it would violate Title VII." Id.

In the Second Amended Complaint, Plaintiffs claim the Employer discriminated against Mr. Weinreb, in violation of Title VII and the PDA, "by its failure to provide David, a male, the same comprehensive medical coverage for his female spouse, Rebecca." (Compl. ¶ 99.) Plaintiffs claim that because GDA is a female-specific illness, and males cannot suffer from GDA, "females have more comprehensive coverage for the (sic) male spouses than males have for the (sic) female spouses." (Id.) The Plan, according to Plaintiffs, provides "unequal benefits for males and females." (Id.) Nowhere in their Complaint do Plaintiffs state that the Employer specifically discriminates against women on the basis of pregnancy or a pregnancy-related condition. Rather, Plaintiffs only assert that the Employer discriminates against Mr. Weinreb, a male with a female spouse.

Notwithstanding the fact that Plaintiffs attempt to make legal arguments in their brief, their assertions miss the point. Plaintiffs have neither pleaded a disparate treatment nor a disparate impact claim cognizable under Title VII and the PDA.

In order to state a claim for disparate treatment, a plaintiff is "required to prove that the defendant had a discriminatory intent or motive." Watson v. Fort Worth Bank & Tr., 487 U.S. 977, 986 (1988); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000); Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1041 (2d Cir. 1993). Mr. Weinreb has not alleged discriminatory intent in his Complaint. He does not allege, for example, that the Plan guidelines were adopted to apply to males or females only, or to discriminate against him or males generally. Nor has he specifically alleged that a female employee of Conduent has ever received fentanyl coverage for a female-specific illness that is not cancer. In fact, a plain reading of the SPD and guidelines would infer that the administrator would deny off-label coverage regardless of sex and regardless of whether the beneficiary were an employee or a spouse. For example, female employees with female spouses who suffer from GDA and sought fentanyl coverage would be denied under the Plan, just as male employees with male spouses who suffer from non-cancer pain would be denied fentanyl coverage.[13]

---

[13] Similarly, the percentage of men who qualify for fentanyl benefits for non-cancer pain under the guidelines is 0%. The percentage of women who qualify for fentanyl benefits for non-cancer pain under the guidelines is 0%. Neither men nor women suffering from non-cancer pain qualify for inferior or superior coverage under the guidelines.

It is the off-label use that is problematic, not the sex of the beneficiary. Cf. Saks v. Franklin Covey Co., 316 F.3d 337, 346 (2d Cir. 2003) ("Infertility is a medical condition that afflicts men and women with equal frequency. . . . In sum, we find that, because the exclusion of surgical impregnation procedures disadvantages infertile male and female employees equally, Saks's claim does not fall within the purview of the PDA.").

Moreover, the guidelines do not delineate based on sex, and even provide for coverage certain sex-specific illnesses. Both men and women experience cancerous pain. Both men and women also experience sex-specific cancers. The plan would presumably provide fentanyl coverage for sex-specific cancer treatment because that treatment is on-label and in accordance with the guidelines.

The administrator's refusal to cover fentanyl had nothing to do with the fact that Mr. Weinreb is a male employee and his wife is female: Caremark's differentiation between cancer and non-cancer patients is wholly unrelated to sex. Unfortunately, because Mr. Weinreb has only alleged that the Employer treated male employees with female spouses differently from female employees with male spouses – tying his sex-discrimination claim

to the gender of a hypothetical heterosexual employee – he failed to state a disparate treatment claim in his Complaint. Cf. Mario v. P & C Food Markets, Inc., 313 F.3d 758, 767 (2d Cir. 2002) ("Mario fails to make out a prima facie case because he presented no evidence to support his contention that P & C's denial of benefits occurred under circumstances giving rise to an inference of discrimination based on [sex or gender.]").

Nor has Mr. Weinreb adequately pled a claim for disparate impact. Disparate impact claims typically rely on statistics, and "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977); see also E.E.O.C. v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus., 186 F.3d 110, 117 (2d Cir. 1999) ("In order to prevail on a disparate impact claim, a plaintiff must initially establish a prima facie case of discrimination. A plaintiff makes such a showing by first pointing out the specific employment practice it is challenging and then demonstrating that the challenged employment practice caused a significant disparate impact on a protected group. A plaintiff may rely solely on statistical

evidence to establish a prima facie case of disparate impact.").

In his Complaint, Mr. Weinreb does not allege that the guidelines have a disparate impact on any protected group. Rather, he only alleges how the guidelines impact him individually. He does not refer to how any other person is covered (or not covered) under the plan, let alone how a group of female or male employees would presumably be covered. He provides no statistical evidence. He does not allege, for example, that fentanyl is prescribed more frequently to men than it is to women, or that women who seek fentanyl off-label are less likely to receive it than are men who seek it.

His conclusory assertion that "females have more comprehensive coverage for the male spouses than males have for the female spouses," (Compl. ¶ 99), is insufficient on its own to prove a disparate impact claim. See Saks, 316 F.3d at 348 ("Saks's argument requires the Court to assume that, if the Plan did provide coverage for surgical impregnation procedures, it would refuse to cover surgical impregnation procedures to treat male infertility. There is nothing in the language of the Plan to support this interpretation."); Massarsky v. Gen. Motors Corp., 706 F.2d 111, 121 (3d Cir. 1983) ("An adverse effect on a single employee, or even a few employees, is not sufficient to

establish disparate impact. . . . We cannot simply assume that a disproportionate number of older employees were adversely affected by the Company's policy of insulating GMI students from layoff." (citations omitted)); see also Bramble v. Am. Postal Workers Union, AFL-CIO Providence Local, 135 F.3d 21, 26 (1st Cir. 1998) ("Where an employer targets a single employee and implements a policy which has, to date, affected only that one employee, there is simply no basis for a disparate impact claim."); Whack v. Peabody & Wind Eng'g Co., 595 F.2d 190, 194 (3d Cir. 1979); Harper v. Trans World Airlines, Inc., 525 F.2d 409, 412-14 (8th Cir. 1976); Robinson v. City of Dallas, 514 F.2d 1271, 1273 (5th Cir. 1975).

Given that Plaintiffs make no allegations regarding how Defendant's Plan impacts a protected group, Plaintiffs' claims under a disparate impact theory fail as well. Accordingly, Plaintiffs' claims under Title VII and the PDA are DISMISSED WITH PREJUDICE.

### D. Equal Pay Act

Defendant Conduent next moves dismiss Plaintiffs' Equal Pay Act ("EPA") claim. In sum, because Plaintiffs tie their Equal Pay Act claims to Mr. Weinreb's sex - and make nothing more than

bald, conclusory allegations that have nothing to do with disparate treatment of one employee's wages over another - their Equal Pay Act claims are DISMISSED WITH PREJUDICE.

Similar to their Title VII and PDA claims, Plaintiffs allege in their Second Amended Complaint that Conduent violated the EPA "by its failure to provide David, a male, the same comprehensive medical/prescription coverage for his female spouse, Rebecca, [than that which] the Employer provides to its female employees for their male spouses." (Compl. ¶ 97.)[14] Plaintiffs assert that since GDA is a "female-specific illness" and that "males cannot suffer from GDA, females have more comprehensive coverage for their male spouses than males have for their female spouses. By providing unequal benefits for males and females through the Plan, the Employer has discriminated against David on the basis of sex in violation of the EPA." (Id.)[15]

---

[14] Based on this sentence in the Second Amended Complaint, the Court presumes that Plaintiffs bring their EPA claim on behalf of Mr. Weinreb only, not his wife. Because Mr. Weinreb is an employee of Conduent, he has standing to bring an EPA claim.

[15] The Court construes Plaintiffs' EPA claim as timely, notwithstanding the EPA's two-year statute of limitations under 29 U.S.C. § 255. The Second Circuit has made repeatedly clear that under the continuing violation doctrine, "each continuation or repetition of the wrongful conduct may be regarded as a separate cause of action for which suit must be brought within the period beginning with its occurrence" for EPA claims. Pollis v. New Sch. for Soc. Research, 132 F.3d 115, 118–19

The Equal Pay Act prohibits employers from discriminating among employees on the basis of sex by paying higher wages to employees of the opposite sex for "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1) (2012); see also Belfi v. Prendergast, 191 F.3d 129, 135–36 (2d Cir. 1999). "Under the EPA, the term 'wages' generally includes all payments made to [or on behalf of] an employee as remuneration for employment." 29 C.F.R. § 1620.10 (2017) (alteration in original). Remuneration includes "[f]ringe benefits," such as "medical, hospital, accident, life insurance and retirement benefits; profit sharing and bonus plans; leave; and other such concepts." Id. § 1620.11(a). "It is unlawful for an employer to discriminate between men and women performing equal work with regard to fringe benefits." Id. § 1620.11(b).

In order to prove a violation of the EPA, a plaintiff must first establish a prima facie case of discrimination by showing: "i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs

_____

(2d Cir. 1997) (citation omitted). Thus, because it is clear that Ms. Weinreb has been repeatedly denied coverage for fentanyl throughout the course of Mr. Weinreb's (continued) employment, potential EPA violations are ongoing, thus preserving the timeliness of his claims.

requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions." <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295, 1310 (2d Cir. 1995); <u>see</u> <u>also</u> <u>Prendergast</u>, 191 F.3d at 135-36.

Proof of the employer's discriminatory intent is not necessary for a plaintiff to prevail on an EPA claim. <u>See</u> <u>Pollis</u>, 132 F.3d at 118; <u>see</u> <u>also</u> <u>Prendergast</u>, 191 F.3d at 135-36 ("The Equal Pay Act creates a type of strict liability; no intent to discriminate need be shown." (citation omitted)); <u>Downes v. JP Morgan Chase & Co.</u>, No. 03 CIV. 8991 GEL MHD, 2006 WL 785278, at *16 (S.D.N.Y. Mar. 21, 2006) ("While claims for wage-discrimination under the EPA and under Title VII are quite similar, . . . the most noteworthy difference between the two is that the EPA does not require the plaintiff to make a showing of discriminatory intent." (citations omitted)). Thus, a <u>prima</u> <u>facie</u> showing gives rise to a presumption of discrimination.[16]

Plaintiffs' claims fail as a matter of law. Nowhere in

---

[16] Once a plaintiff makes out a <u>prima</u> <u>facie</u> case under the EPA, the burden of persuasion then shifts to the defendant to show that the wage disparity is justified by one of the affirmative defenses provided under the Act: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1) (2012). However, as explained <u>infra</u>, the Court need not analyze Defendant's affirmative defenses because Plaintiffs have not met their burden of presenting a <u>prima</u> <u>facie</u> case.

their Complaint do Plaintiffs allege that Mr. Weinreb "ii)
perform[s] equal work on jobs requiring equal skill, effort, and
responsibility," nor are there allegations that "iii) the jobs
are performed under similar working conditions." Tomka, 66 F.3d
at 1310. All Plaintiffs assert is that male employees with
female spouses receive unequal benefits. (Compl. ¶ 97.)

The Second Circuit has made clear that the EPA pleading
standard is "demanding." See E.E.O.C. v. Port Auth. of N.Y. and
N.J., 768 F.3d 247, 255-56 (2d Cir. 2014); see also id. ("[A]
successful EPA claim depends on the comparison of actual job
content; broad generalizations drawn from job titles,
classifications, or divisions, and conclusory assertions of sex
discrimination, cannot suffice. At the pleading stage, then, a
plausible EPA claim must include 'sufficient factual matter,
accepted as true' to permit 'the reasonable inference' that the
relevant employees' job content was 'substantially equal.'"
(citation omitted) (emphasis added)).

Given the complete absence of any factual allegations
whatsoever relating to actual job content or working conditions,
the Court dismisses Plaintiffs' EPA claims as a matter of law.
See id. at 258 ("Simply put, the EEOC has not alleged a single
nonconclusory fact supporting its assertion that the claimants'

and comparators' jobs required 'substantially equal" skill and effort."); Suzuki v. State Univ. of N.Y. Coll. at Old Westbury, No. 08-CV-4569 TCP, 2013 WL 2898135, at *4 (E.D.N.Y. June 13, 2013) ("Bald allegations that male employees were paid more than female employees, however, will not survive a motion to dismiss, particularly in light of the standards set forth in Bell Atlantic Corporation v. Twombly, [550 U.S. 544, 555 (2007)]."); see also Hughes v. Xerox Corp., 37 F. Supp. 3d 629, 645 (W.D.N.Y. 2014) ("[T]o withstand a motion to dismiss, the plaintiff must allege how her position and the comparison positions were substantially similar. . . . District courts have not hesitated to dismiss equal pay discrimination claims where the plaintiff simply alleges, in a conclusory manner with no supporting factual basis, that she was paid less than her male co-workers for the same or similar work."); Lehman v. Bergmann Assocs., Inc., 11 F. Supp. 3d 408, 420 (W.D.N.Y. 2014) ("How was her position comparable or substantially similar? What responsibilities did they share? Without these facts, courts routinely dismiss EPA claims pled in this formulaic fashion.").

Accordingly, because Plaintiffs speak nothing of comparative job content or working conditions in their complaint, Plaintiffs' EPA claims are DISMISSED WITH PREJUDICE.

## E. Section 1557 of the Affordable Care Act

Finally, Defendant Caremark moves to dismiss Plaintiffs'
fourth cause of action for sex discrimination under the
Affordable Care Act ("ACA"). As explained infra, because
Plaintiffs' Complaint alleges no facts to support a finding that
Caremark intentionally discriminated against Mr. or Ms. Weinreb,
nor that the discrimination was a substantial or motivating
factor in Caremark's actions, their claims under the ACA are
DISMISSED WITH PREJUDICE.

In their Second Amended Complaint, Plaintiffs assert that
Caremark receives federal financial assistance and is engaged in
a health program or activity as defined by the ACA. (Compl. ¶
102.) Plaintiffs claim that "Caremark's interpretation of the
Plan to exclude coverage of fentanyl for Rebecca . . . is a rule
that discriminates against females who, as opposed to males, can
suffer from GDA." (Id. ¶ 103.) According to Plaintiffs, "the
result of such [an] interpretation . . . is discriminatory
against her on the basis of sex [because] GDA is a disease
suffered only by females . . . . [T]his is a Plan rule that
results in an exclusion that is female specific and . . .
provides inferior coverage to women than to men." (Id.)

Section 1557 of the Affordable Care Act prohibits discrimination and the denial of benefits on the basis of race, color, national origin, sex, age, or disability "under any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a) (2012).[17]

Section 1557 expressly incorporates four federal civil rights statutes that provide the protected grounds of discrimination and accompanying burdens of proof: race, color, and national origin (under Title VI); sex (under Title IX); age (under the ADEA), and disability (under the Rehabilitation act). Id.; see also Se. Pa. Transp. Auth. v. Gilead Scis., Inc., 102 F. Supp. 3d 688, 696 (E.D. Pa. 2015) (holding that the standard and burden of proof for a discrimination claim under Section 1557 changes depending upon the type of discrimination alleged

---

[17] 42 U.S.C. § 18116—Nondiscrimination provides:
    (a) In general
        Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments).

and should be drawn from the relevant statute listed in 42
U.S.C. § 18116(a)). Thus, a Plaintiff suing a Defendant for
discriminating in the denial of benefits under the ACA must
essentially plead a corresponding civil rights statute predicate
in order to make out a valid Section 1557 ACA claim.[18] See 45
C.F.R. 92.301 (2017) ("[T]he enforcement mechanisms available
for and provided under . . . Title IX of the Education
Amendments of 1972 . . . shall apply for the purposes of Section
1557 as implemented by this part.").

Most notably, Section 1557 incorporates Title IX sex
discrimination protection (and its accompanying pleading
standards).[19] Section 1557 does not incorporate sex
discrimination protection as defined under Title VII. Id. In
effect, what this means is that a plaintiff suing for sex

---

[18] Like many other Courts before it (and as it is undisputed by the
Parties), this Court agrees that the ACA provides for a private right
of action in the first place. See, e.g., Briscoe v. Health Care Serv.
Corp., 281 F. Supp. 3d 725, 737 (N.D. Ill. 2017); Se. Pa. Transp.
Auth., 102 F. Supp. 3d at 698; Callum v. CVS Health Corp., 137
F.Supp.3d 817, 848 (D.S.C. 2015); see also Rumble v. Fairview Health
Servs., No. 14-cv-2037, 2015 WL 1197415, at *7 n.3 (D. Minn. Mar. 16,
2015) ("The Court reaches this conclusion because the four civil
rights statutes" that Congress "referenced and incorporated into
Section 1557 permit private rights of action.").

[19] 20 U.S.C. § 1681(a), or Title IX, provides, in relevant part:
No person in the United States shall, on the basis of sex, be
excluded from participation in, be denied the benefits of, or be
subjected to discrimination under any education program or
activity receiving Federal financial assistance.

discrimination under the ACA is only able to put forward an intentional discrimination claim, not a disparate impact claim, because Title IX, unlike Title VII, does not provide for disparate impact theories. See Nungesser v. Columbia Univ., 244 F. Supp. 3d 345, 361-62 (S.D.N.Y. 2017) ("While a private plaintiff may bring a claim under Title IX for intentional discrimination, courts have held that a private right of action based on the alleged disparate impact of a policy is not cognizable under Title IX." (citing Xiaolu Peter Yu v. Vassar Coll., 97 F. Supp. 3d 448, 461 (S.D.N.Y. 2015); Doe v. Columbia Univ., 101 F. Supp. 3d 356, 367 (S.D.N.Y. 2015)); see also Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993).

A plaintiff suing under Title IX must show that "the defendant discriminated against him or her because of sex; that the discrimination was intentional; and that the discrimination was a 'substantial' or 'motivating factor' for the defendant's actions." Doe v. Columbia Univ., 101 F. Supp. 3d at 367 (citing Tolbert v. Queens Coll., 242 F.3d 58, 69 (2d Cir. 2001)).

Plaintiffs' Complaint alleges no facts to support a finding that Caremark intentionally discriminated against Mr. or Ms. Weinreb, nor that the discrimination was a substantial or motivating factor in Caremark's actions. Rather, just as

Plaintiffs did with their Title VII and EPA claims, Plaintiffs only make conclusory assertions that relate to Defendants' failure to cover Ms. Weinreb's medications; they speak nothing of Defendants' intentions to interpret and apply the guidelines in a discriminatory way. See Yusuf v. Vassar Coll., 35 F.3d 709, 712–14 (2d Cir. 1994) ("A plaintiff alleging racial or gender discrimination [under Title IX] must do more than recite conclusory assertions. In order to survive a motion to dismiss, the plaintiff must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of racially discriminatory intent."); Albert v. Carovano, 851 F.2d 561, 572 (2d Cir. 1988) ("The naked allegation that appellees 'selectively enforc[ed] the College rules . . . against plaintiffs . . . because they are black [or] Latin' is too conclusory to survive a motion to dismiss." (alterations and ellipses in original)); Martin v. N.Y.S. Dep't of Mental Hygiene, 588 F.2d 371, 372 (2d Cir. 1978) ("It is well settled in this Circuit that a complaint consisting of nothing more than naked assertions, and setting forth no facts upon which a court could find a violation of the Civil Rights Acts, fails to state a claim under Rule 12(b)(6). . . . Since Martin has alleged only that he was denied the perquisites

of his position because of his race, his suit falls squarely within the rule established in this line of cases."); Manolov v. Borough of Manhattan Cmty. Coll., 952 F. Supp. 2d 522, 527 (S.D.N.Y. 2013) ("Plaintiff's conclusory allegations that inter alia, his professors 'blatantly discriminated against all white males,' and that 'he felt the hostility of his professors towards him because of his sex,' are insufficient to allege a cause of action."); see also Briscoe v. Health Care Serv. Corp., 281 F. Supp. 3d 725, 739 (N.D. Ill. 2017) (dismissing Section 1557 claim for sex discrimination because complaint lacked factual allegations to support intentional discrimination under Title IX); Cruz v. Zucker, 116 F. Supp. 3d 334, 347-49 (S.D.N.Y. 2015) (same).

Thus, because Plaintiffs have alleged no facts supporting an inference that Defendants intentionally discriminated against Ms. Weinreb, or that discrimination was a motivating factor in their actions, Plaintiffs claims do not satisfy the pleading standards for a Title IX sex discrimination claim. Accordingly, their ACA claims fail as a matter of law.

### F. Leave to Replead

When a complaint has been dismissed, permission to amend it "shall be freely given when justice so requires." Fed. R. Civ.

P. 15(a). However, a court may dismiss without leave to amend when amendment would be "futile," or would not survive a motion to dismiss. Hutchinson v. Deutsche Bank Secs. Inc., 647 F.3d 479, 490–91 (2d Cir. 2011). "Repeated failure to cure deficiencies by amendments previously allowed" is grounds for a District Court to deny leave to replead. Foman v. Davis, 371 U.S. 178, 182 (1962) (noting undue delay, bad faith, dilatory motive, undue prejudice, and repeated failure to cure deficiencies by amendments previously allowed all as reasons for District Court to exercise its discretion to deny leave to replead).

Plaintiffs have been given multiple opportunities to amend their Complaint and cure any deficiencies. (See Dkts. 42, 46, 59.) Though they do not move formally for leave to replead at this juncture, the Court declines to grant them another such opportunity given their repeated failure to plead a sustainable cause of action. Leave to replead is DENIED.

III. Conclusion

For the reasons stated herein, Defendants' Motions to Dismiss are GRANTED. The Complaint is DISMISSED WITH PREJDUICE

in its entirety, without leave to replead.

The Clerk of Court is directed to close the docket in this case.


SO ORDERED.

DATED:      New York, New York
            August 29, 2018


_____
        Deborah A. Batts
United States District Judge